## LITCHFIELD BANK *vs.* CHARLES S. CHURCH.

A bank was fraudulently got up, under a lawful charter, by parties who induced the defendant to subscribe for a portion of the stock, representing to him that his subscription would be merely nominal and that he would not be required to pay for the stock. The bank was organized, issued a large amount of bills, and soon after failed and went into the hands of receivers for the benefit of its creditors. In a suit brought by the receivers in the name of the bank against the defendant upon his subscription, it was held that he could not avail himself, in defence, of the fraudulent character of the bank, or of the misrepresentations under which he had been induced to subscribe for the stock. He with his associates constituted the bank, and he therefore shared with them in the fraud of the bank on the public.

The defendant's subscription was made in his name by an attorney, under a power authorizing him *to subscribe for one hundred shares of the stock and to do whatever was necessary to be done in the premises.* The charter required that, at the time of subscribing, ten per cent. should be paid to the commissioners. The defendant furnished the attorney with no funds for this payment, and gave him no express authority to make it, but the payment was in fact made by the attorney, with funds furnished him by other parties for whom he was acting. Held, that the power of attorney authorized such payment, and that the subscription became by the payment a valid one.

The charter provided that a board of commissioners named therein, should receive subscriptions to the stock of the bank, and should apportion the stock among the subscribers, holding a public meeting for the purpose, and certifying their result in a manner specially provided. Among the subscriptions received and allowed by the commissioners, was one for one hundred shares, in the name of *J R H* by "*E. L. H.* attorney." *J R H* was the wife of *E. L. H.* The defendant claimed that this subscription was invalid, and that by reason thereof his own subscription was not binding, and the organization of the bank never legally perfected. Held, 1. That the decision of the commissioners that the whole amount of the stock was legally taken, was final upon the question whether the bank was in that respect legally organized. 2. That even if the subscription in question was not a valid one, it did not render the defendant's subscription invalid; but that such a subscription was not necessarily an invalid one. 3. That the defendant ought to have objected to the subscription before the commissioners, and not having done so, could not make the objection here. 4. That so far as the question pertained to the legal capacity of the bank to sue, it could not be made on the general issue.

Remarks on the duties and responsibilities of commissioners in such a case.

The superior court was adjourned from the court house to a hotel in the same town, where one of the jurors was sick, for the purpose of taking the verdict; and the jury was there empanneled and the verdict taken. Held, that it was lawfully done.

ASSUMPSIT, brought by the receivers of the Litchfield Bank

in the name of the bank. The declaration contained several counts upon certain promissory notes executed by the defendant to the bank, and held by the bank at the time of its failure, amounting together to the sum of $2,056.44, and a count upon a subscription of the defendant to the capital stock of the bank at the time of its organization. It appeared that the original subscription of the defendant was for one hundred shares of the stock, and that at the time of the failure of the bank he was the holder of twenty shares. The notes were given in payment for these twenty shares. The defendant pleaded the general issue, with notice of sundry matters of defense, the principal of which were that the notes were given without consideration, and that the bank was fraudulently gotten up, and his subscription to its stock fraudulently obtained. The notice with regard to the latter point was as follows :—" And if it shall become necessary the defendant will claim, and offer evidence to prove, that said bank was a fraudulent and bogus concern from the beginning, intended and calculated to deceive and defraud whoever might be drawn in to make contracts with it ; that its pretended organization and all its transactions were fraudulent and illegal, and its books, records, and the pretended account of its transactions were false and fraudulent, and were kept in a deceptive manner, from its commencement to the time when it went into the hands of the receivers as an insolvent institution ; that its stock never was subscribed for in any *bona fide*, honest and legal manner ; that no money was ever paid upon any of the pretended subscriptions to the stock, and that the pretended payment of installments was a false and fraudulent pretense ; all of which facts were at all times well known to the plaintiffs ; that the defendant was not present at the time of said pretended subscription, and down to the time of the commencement of this suit was entirely ignorant of all the aforesaid facts, all of which facts the plaintiffs at all times cunningly concealed from him. And the defendant will prove that if he ever executed said notes, or any contracts with said bank, he was induced to do the same by such artful concealment, and by the false and fraudulent representations of the

plaintiffs that said bank was all right, and a good bank, and its proceedings all legal, when the plaintiffs well knew the contrary."

On the trial of the case to the jury, it appeared in evidence, and was not denied, that the defendant, by Henry B. Graves, Esq., his attorney for that purpose, subscribed for one hundred shares of the capital stock of the bank, and that at the time of subscribing Graves paid to the commissioners ten per cent. upon the shares so subscribed. It also appeared that the subsequent installments thereon were duly called for and notice thereof given to the defendant, who had neglected to pay them. No question was made but that the whole amount of the capital of the bank was subscribed for, and regularly allotted by the commissioners, and the bank duly organized in point of form, and that one hundred shares were allotted to the defendant under his subscription ; but the defendant claimed that a large majority of the shares were taken at the request of certain persons residing in New York, to be held for them, with the intention that the bank should be managed for their benefit and be under their control ; and that the subscribers to the stock were mostly merely nominal subscribers, not intending to have any real interest in the bank, but expecting that their stock would be paid for, if paid for at all, by the persons thus to be interested in it. To prove which, and to prove that it was not expected or intended that the defendant should ever pay for the stock subscribed for by him, the defendant offered evidence to prove, and claimed that he had proved, that Mr. Graves applied to him, and represented that it was necessary, in order to save the charter of the bank, that the capital stock should be nominally taken, and requested him to subscribe for and take one hundred shares of the stock, and assured him that it would not be necessary for him to pay for the same ; and that thereupon he gave to Mr. Graves a power of attorney to subscribe for the same for him ; and the defendant claimed that after the subscription he did not regard himself as a stockholder, and took no notice of the proceedings of the bank after its organization.

The power of attorney was as follows :—" Know all men by

these presents that I, Charles S. Church, have made, constituted and appointed, and by these presents do make, constitute and appoint, Henry B. Graves Esq., my true and lawful attorney, for me and in my name, place and stead, to subscribe for one hundred shares of the capital stock of the Litchfield bank; giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever, requisite and necessary to be done in and about the premises, as fully, to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation; hereby ratifying and confirming all that my said attorney or his substitute shall lawfully do or cause to be done by virtue hereof.        CHARLES S. CHURCH."

The whole stock of the bank having been subscribed and apportioned to the subscribers, and ten per cent. thereon, amounting to $10,000, having been paid to the commissioners by the subscribers, the commissioners retained the same until the stockholders appointed directors, and the directors appointed a president of the bank, when they paid the same over to the president, who deposited it in the Iron Bank at Canaan, taking a certificate of deposit therefor. This certificate of deposit he afterwards delivered to one Rumsey, taking therefor the paper of individuals, but whether of any value did not appear. The defendant claimed that Rumsey was one of the persons for whose benefit the majority of the stockholders, including himself, had subscribed and held their stock, and that he and his associates, fraudulently designing to procure an organization of the bank for their own private purposes, had themselves furnished and caused to be paid for their own benefit the first installment of ten per cent. on the shares subscribed, including the one hundred shares subscribed by the defendant, and that the certificate of deposit of the Iron Bank, was used by Rumsey to pay back to the Iron Bank a loan, obtained by him and his associates from that bank for the purpose of enabling them to make the payment of the first installment to the commissioners. The defendant also claimed that he never in fact paid or authorized any other person on his

behalf to pay the first installment of ten per cent. unless such authority was inferable from the power of attorney given to Mr. Graves. At the time of executing the power of attorney to Graves, the defendant, also at Graves' request, executed another power of attorney to E. L. Houghton, to transfer his stock, but leaving the name of the transferee blank. Evidence of these facts was offered by the defendant for the purpose of showing that the whole organization of the bank was a fraud upon him, and that no stock was ever legally taken by him, and he prayed the court to charge the jury that, if these facts were proved to their satisfaction, no recovery could be had against him. It was not claimed, however, that the commissioners did not act in good faith, or that they had any knowledge that any of the subscriptions to the stock were not made in good faith by the persons who appeared as subscribers for the stock. The court did not charge the jury as requested by the defendant.

The defendant further claimed and offered evidence to prove that one hundred shares of the stock of the bank, if subscribed for at all, were subscribed for in the name of J. R. Houghton, by E. L. Houghton as attorney. It appeared that J. R. Houghton was then a married woman, and that E. L. Houghton was her husband; and the defendant prayed the court to charge the jury that, if this was proved to their satisfaction, and if the subscription of one thousand shares was not filled up without taking into the account the hundred shares thus subscribed, the organization of the bank could not take effect, and the plaintiffs could not recover. The court did not so charge the jury.

The defendant offered in evidence the testimony of one Berry, who was also a subscriber to the stock of the bank, to show that the bank did not collect or attempt to collect of him the installments on his stock, but the court excluded the evidence.

The jury having rendered a verdict for the plaintiffs, the defendant moved for a new trial.

The defendant also filed a motion in arrest of judgment upon the following facts, which were found by the court in a

hearing upon the motion. After the cause was committed to the jury, and they had agreed upon their verdict, one of the jurors was taken sick at the hotel where he was staying in the village of Litchfield, so that he could not with safety come into the court house to deliver the verdict, and at the request of the jury, through the foreman, and in the presence of the parties and their counsel, but without the consent of the defendant, the court was by the judge publicly adjourned to the hotel, which was in the immediate vicinity of the court house, for the purpose of receiving the verdict, and the court was there opened, and the jury being called by the clerk delivered to him their verdict, which was read by the clerk, and accepted by the court, after which the jury were dismissed from the further consideration of the cause.

The plaintiffs on the trial claimed to recover the full amount of the notes described in the declaration, and claimed that they were given for twenty shares of the capital stock of the Bank, and that, if they were not entitled to the amount of the notes, they were entitled to recover the amount of the defendant's subscription for twenty shares of the stock, after deducting the first installment of ten per cent. thereon, which was paid by the defendant's attorney at the time he subscribed for the same; and the question whether the plaintiffs were entitled to the amount of the notes, or to the amount due on the subscription, was submitted to the jury, who returned a verdict for the plaintiffs for the sum of $2,301.10. The plaintiffs did not claim to recover both the amount of the notes and of the subscription for the stock, but claimed that the notes were in fact given for the twenty shares of stock, and included the full amount originally due for the same without a deduction of the ten per cent. paid thereon, which the defendant admitted that he had never paid himself, and as to which he had claimed that the payment made by his attorney was without his authority or consent. The plaintiffs entered a remittitur for the amount of the verdict above the amount due upon the notes, but the defendant still claimed that the verdict was too large by the amount of the ten per cent. installment paid at the time of the subscription.

The motion in arrest was overruled by the superior court, but by agreement of the parties the questions arising upon it were submitted to this court in connection with the motion for a new trial.

*H. Dutton,* with whom were *Hubbard* and *Ransom,* in support of the motions.

1. The defendant is not liable upon his subscription for the stock, as he never became a legal subscriber. The subscription was void because the ten per cent. was not paid. By the terms of the charter if this should not be paid the subscription was to be void. 3 Private Acts, 98. The language is very similar to that of the statute with regard to usury, and the defendant here can set up the invalidity of his subscription, as the borrower can there the invalidity of his note. There was no payment of the ten per cent. unless the payment by Mr. Graves is to be regarded as that of the defendant; but Mr. Graves had no authority to make the payment unless it is implied in the power of attorney. We claim that the power to subscribe for the stock does not imply the power to make the payment. The defendant did not know that such a payment was required, furnished no money for it, and never afterwards ratified the act. He merely authorized the use of his name in subscribing for the stock, executing at the same time a power of attorney to transfer the stock to other parties. Ang. & Ames on Corp., § 527. *Union Turnpike Company* v. *Jenkins,* 1 Caines, 381. *Center Turnpike Co.* v. *Mc Conaby,* 16 Serg. & R., 140. *Bouton* v. *Am. Mutual Life Ins. Co.,* 25 Conn., 542.

2. But if the defendant is to be regarded as a legal subscriber to the stock, then we say that he is not bound by his subscription, because of the fraudulent character of the bank. He was imposed upon by the parties interested in getting up the bank. They solicited his subscription and represented to him that the bank was a good one, organized lawfully and in good faith, and he subscribed under that belief. But it is said that, as a stockholder, he is himself a partaker in their fraud. But he never in fact authorized their fraudulent acts. He

never had any actual participation in them. He never even knew of them. And besides, the fraud was a fraud upon him in getting him to subscribe, as much as upon the public in getting them to take the bills of the bank.

3. The bank was never legally organized. The charter requires that a capital stock of $100,000 should be subscribed. This of course means legally subscribed. But $10,000 of the stock, one tenth of the whole capital, was taken by a married woman, who had no power to make such a contract; and not only so, but was taken in her name by her husband acting as her agent. That this was moreover a mere pretended subscription is manifest from the fact that the husband had already taken $10,000 of the stock in his own name, while neither he nor his wife was worth a dollar. As the subscription of the wife could not legally have been collected, it is to be regarded as a nullity, and the stock of the bank as not having been fully taken. If the stock was not fully taken, the defendant is not holden on his subscription. Besides, if the bank was not legally organized it never became a corporation and can not sustain a suit.

4. If the bank itself could not have recovered against the defendant, the receivers can not. They take merely the rights of the bank as its assignees. The suit is brought in the name of the bank and is open to any defense which could be made against the bank itself.

5. The motion in arrest ought to prevail. The only place recognized by law for the holding of the superior court, and the rendition of a verdict in that court, is the court house. The verdict should also be arrested because for too large a sum. If the defendant is held liable on his subscription, it can only be because the subscription was made valid by the payment of the ten per cent. by Mr. Graves. But in the verdict this payment was not deducted from the amount of the subscription. After the remittitur made by the plaintiffs there still remains this sum to be deducted, and if a further remittitur to this amount is not made the judgment should be arrested.

*G. C. Woodruff* and *Catlin*, contra.

1. The defendant by his subscription became a legal subscriber to the stock of the bank. The ten per cent required by the charter to be paid at the time of subscribing was actually paid. If the payment was not authorized by the defendant, yet he can not set up that fact. The commissioners accepted the subscription, with the payment, as a valid subscription, and the defendant can not now claim that it is not so. But the power of attorney to Mr. Graves gave him ample authority to pay the money. It authorized him to subscribe and to do whatever was necessary for the purpose. The blank power of attorney to transfer the stock, given at the time, can not affect the case. Besides, it was never acted upon. *Mann* v. *Cook*, 20 Conn., 178. *Mann* v. *Currie*, 2 Barb., 299.

2. The whole amount of the capital was legally subscribed. No question is made except as to the subscription of Mr. Houghton in the name of his wife. But this was a lawful subscription. Stock is often thus taken. If the wife would not be holden personally, yet the husband would be. Besides, it does not appear but that the whole subscription was paid down in cash at the time. But however this may be, the defendant can not go behind the return of the commissioners, who have received and allowed this subscription as a valid one. They were appointed by the legislature for the special purpose of acting upon the subscriptions to the stock, and they have reported that the whole $100,000 was legally taken, and their decision is final. If it were not so, and if the subscription of Mrs. Houghton was not a legal one, yet the defendant's subscription would not be invalidated thereby.

3. The defendant can not avail himself of the fraudulent character of the bank, or of the fraud practiced by interested parties upon him in inducing him to subscribe for the stock. If he was innocent in the matter, yet as other innocent parties have been injured by his act, he ought to suffer rather than they. But he had no right to subscribe for the stock under the assurance that he would not have to pay his subscription and that it would be a mere matter of form. He was thus lending

himself to the fraud which these parties were evidently preparing to practice on the public. The bank is in no way responsible to him for the false representations of these parties. Mr. Graves was not the agent of the bank. It was not yet organized. When afterwards organized he was a stockholder in it, and a participator in whatever fraud was practiced by the bank on the public. *Mangles* v. *Grand Collier Dock Co.*, 10 Simons, 519, 539. *Powis* v. *Harding*, 37 Eng. Law & Eq., 451. *Henderson* v. *Royal British Bank*, 38 id., 86. *Daniell* v. *Royal British Bank*, id., 559. *McFarlan* v. *Triton Ins. Co.*, 4 Denio, 392.

4. The court was lawfully adjourned to the public house. There is no law that requires that the court should be holden in the court house. It was still holden within the town designated by law as the county seat. The court had a right to use its own discretion as to the proper place of sitting.

5. The verdict is not wrong in making no allowance for the ten per cent payment. The defendant denied that he had ever made it, or authorized Mr. Graves to make it, and it appeared that it was not paid with the defendant's money. The notes were given some months after the subscription, and for the amount of twenty shares, with no deduction for the ten per cent payment. The defendant had subscribed for one hundred shares and settled with the bank by giving his note for twenty. It does not appear but that the payment was in some way brought into this settlement. At all events, the jury heard all the evidence and have decided that the defendant was liable for the whole sum ; and as the declaration is sufficient for a recovery of that amount, even if the jury were in error, there is no ground for a motion in arrest of judgment.

ELLSWORTH, J. We will dispose of some of the minor questions in the case before we proceed to express our views upon those which have been treated as more serious and important.

And first, as to the motion in arrest. This is founded, in part, on the circumstance that the court adjourned to the house of Mr. Spencer, a few rods from the court house, for

the purpose of receiving the verdict of the jury, because of the sudden illness of one of the jurors. We know of no law or practice of our courts which is inconsistent with this proceeding. An unavoidable emergency made it necessary. The court was still holden in Litchfield, the place appointed by law, while no precise place in the town is designated by the statute. The house or room may be selected or changed, as necessity or convenience may require.

Again, it is said the damages are too large for the declaration. But they do not appear to be beyond the face of some of the counts in the declaration, which would be necessary to sustain a motion like the present ; and it certainly does not appear upon what count or counts the plaintiffs recovered their damages. The exact consideration of the notes in suit, whether it was more or less than is expressed in them, does not appear. Doubtless the notes grew out of the defendant's subscription for one hundred shares of the stock of the bank, but exactly how, or in what manner, does not appear. Only twenty shares seem to have been retained by the defendant on a final settlement with the bank, which, for some reason not apparent, were agreed to be taken and paid for at par. The rest were taken back. If in this settlement there was a mistake or misapprehension, (of which however we see no evidence,) it should have been put right on the trial, and for aught we know, this very matter was brought up on the trial and decided against the defendant. That it might have been is sufficient for the present occasion. We admit, or at least it seems so to us now, that if the only cause of action was the defendant's subscription for twenty shares of stock, at par, and an installment of ten dollars had been paid on them, the plaintiffs have recovered too large a verdict; but we can not say that this is the case. We apprehend that it is not. The bank undoubtedly made some new arrangement with the defendant, and agreed to take his notes for just what they express and to release him from any thing beyond. Besides, the objection to the excess of damages can not be made on the present motion. To reach that error the motion should have been for a new trial for a verdict against evidence.

As to the real merits of the defense, considered either in relation to the notes of the defendant or his subscription out of which they sprung, they are much less obvious to us than they seem to be to the learned counsel of the defendant, who has so largely dwelt upon them in his argument. We do not think that any one of the points made by him has been or can be established upon the facts detailed in the motion.

Much the greatest stress has been laid upon the supposed want of organization and legal existence in the bank. It is said that the corporation never came into being, because not formed in the manner pointed out in the charter, and therefore, in legal contemplation, was not at the first, and is not now, a legal corporation or bank ; and the reasons stated are, that the one hundred shares, of the one thousand required to be subscribed before the bank could go into operation, were really never perfected in the defendant, because, as he says, he did not pay the first installment of ten dollars on a share ; and further, that the subscription for another hundred shares was made by E. L. Houghton, in the name of his wife, J. R. Houghton.

To this conclusion of the defendant's counsel we can not give our assent: for, first, the question of the organization and existence of the corporation can not be raised under the general issue, which is the issue on trial. So this and other courts have repeatedly decided. The objection goes only to the character of the plaintiffs. It is of a preliminary nature, and must be made, if at all, in an early stage of the case. *Phœnix Bank* v. *Curtis*, 14 Conn., 437. *West Winsted Savings Bank* v. *Ford*, 27 id., 288. *Champlin* v. *Tilley*, 3 Day, 303. *Sutton* v. *Cole*, 3 Pick., 232, 245. *Penobscot Boom Corporation* v. *Lamson*, 16 Maine, 224. *Bank of Manchester* v. *Allen*, 11 Verm., 302. *Bank of Utica* v. *Smalley*, 2 Cowen, 770. *School District* v. *Blaisdell*, 6 N. Hamp., 197.

In the next place, we think the doings of the commissioners are conclusive on this point. The commissioners under this charter were specially deputed by the legislature to repair to Litchfield, in order to superintend the subscription to the bank, and decide and certify to the subscribers when the requisite

amount of stock had been taken, and by whom, in order that the stockholders might make choice of directors and enter upon the appropriate business of the institution. This they did, and they gave their certificate that the one thousand shares were subscribed, naming the defendant and J. R. Houghton therein as stockholders, each to the amount of one hundred shares, and the corporation commenced business and issued bills to a large amount. If after this the defendant can attack the commissioners' certificate and show it to be untrue, especially for the reason that the one thousand shares were never effectually subscribed, there is no safety for any one in relying upon the preliminary and initiatory proceedings in such cases, and the form had better be abandoned as deceptive and useless.

And now that we are upon the conclusive effect of the commissioners' doings, we can not avoid remarking that commissioners appointed for such a purpose are charged with a trust of no ordinary responsibility. The legislature most justly expects of them that they will bring to the discharge of this duty vigilance, firmness and integrity. They are called to launch upon the community a monied corporation invested with the franchise of issuing bank notes, and they are bound to see, as far as it may be in their power, that the proceedings are in good faith, and the foundation of the bank real, and not formal merely, and illusory. They certify that the subscription is fairly and fully made up as required by law and that the installment is paid and applied, so that the bank can commence its business with the capital prescribed, and is worthy of credit as having received their sanction and approval. All this may properly be inferred and is inferred by the public from their doings, and if the necessary vigilance and firmness are wanting on their part, nothing is more likely to occur than fraudulent practices by unscrupulous speculators, and in the end consequent loss and damage to the uninitiated and confiding. We do not mean to intimate that the commissioners in this case could have discovered more of the character of the early proceedings of the corporation, or should have sifted

the subscription more thoroughly than was done, but obviously, if the subscription is closely scanned, it presents some very weak points as the basis of a solid institution; and it was in fact a very bad basis if the defendant has spoken the truth in the notice of his defense. Certainly the bank itself has turned out to be a great fraud, and the management with regard to it a breach of law of no ordinary turpitude.

Again, so far as the notes are the ground of the plaintiffs' action, made as they were for and in consideration of the subscription for stock, to give the bank credit to do business, we can not allow them to be called in question by the defendant for the reasons assigned. What if he had not paid his first installment, or what if J. R. Houghton was a married woman and could not be sued herself on her subscription, what is that to the defendant, who came forward and claimed to be a stockholder by reason of his subscription, and was admitted to be such, and gave his notes for the amount of twenty shares at par value, and was released by the bank from the remaining eighty? This must operate to estop him forever from pleading this defense.

Much was said on the argument about fraud committed on the defendant by the bank. It was said, in the language of the defendant's notice, "that the bank was a fraudulent and bogus concern from the beginning, intended and calculated to deceive and defraud whoever might be drawn in to make contracts with it, that its pretended organization and all its transactions were fraudulent and illegal," and much more of the same character. We believe this statement to be substantially correct. But what then? Who, we ask, is the bank that has done this? And who ought to bear the loss of such frauds? The creditors of the bank, (represented here by these receivers,) who have been induced to trust the bank as a legal and upright institution, or the stockholders, who held themselves out as constituting the bank, and who were recognized and adjudged to be so by the commissioners? There can be but one answer to these questions. The defendant should remember that he was one of the actors himself, and, judging from his large subscription, (one tenth of the whole,) a

prominent actor. He gave his name, and must have understood that it would be used, and wished it to be used, by Mr. Graves, his attorney, just as it was used. He afterwards acted personally as a stockholder, and made a settlement with the bank, cancelling his entire subscription by giving his notes for just twenty shares at par; a settlement, by the by, of a piece with the rest of the business and which will not very well bear the scrutiny of the law. But it closes his mouth.

But as to this first installment, we say further that it was paid at the time of the subscription, and has never been repudiated by any one, and so the defense has not even any fact upon which it can rest. Mr. Graves was fully and duly empowered to subscribe for the defendant, and hence to do whatever was essential to make the subscription binding and effectual, and therefore to pay the installment for the defendant, as else the subscription could not have been taken by the commissioners, but would have been rejected. We are satisfied therefore that these one hundred shares were well subscribed for and the installment well paid.

Nor is there any force in the objection that one hundred shares were subscribed in the name of Mrs. Houghton. We have already said that this question can not be raised in this stage of the case, but if it can, it does not appear on the face of the proceeding but that the husband intended to give the stock to his wife, just as a parent takes stock in the name of a minor child, pays for it himself and gives it to his child. This can lawfully be done, and might properly enough have been done in this instance if Houghton himself had been a man of means. So the balance of eighty dollars on a share might then or afterwards have been paid. The thing is possible though not very probable. So the defendant, or his attorney present at the time and conversant with the fact and the form of this large subscription, (the husband and wife taking twenty thousand dollars,) as we must believe, should have raised his objection before the commissioners, when the subscription could have been found incomplete and have been rejected. If indeed there was anything of a bogus character about this subscription, anything wrong and deceptive, then

if ever was the time to make it known to the commissioners. Probably this entire subscription of twenty thousand dollars by Houghton, (though, as it now appears from what is said, he was then an adventurer from New York wholly destitute of property,) was indispensable to make up the amount necessary to place the institution on a " firm basis."

Besides, we think the defendant's subscription would not of course become void though some part of the one thousand shares subscribed in the whole should fail or become uncollectible, as if some subscriber should be proved to have been under age at the time of subscribing. The defendant having himself subscribed, and with others presented to and induced the commissioners to accept the subscription as full and complete, in order that the bank might be started and its bills put in circulation, can not now complain that the creditors call upon him to make good his own engagements.

We have thus endeavored to answer the defendant's objections to the validity of his subscription and his notes therefor, and to show that he ought not on any principle of law or equity to prevail in his defense. We think we have succeeded in the attempt. Some other objections were alluded to on the argument, but they were not much pressed, and certainly were of a trifling nature, while the great features of the case are obvious and controlling. The defendant united with others to get up a bank in the town of Litchfield. They succeeded in the effort, and the defendant, with more or less culpability on his part, palmed off, or enabled and countenanced others in palming off, upon the people of the county and the public generally, a rotten bogus corporation. In our judgment the smallest atonement he can possibly make for this violation of law, is readily and cheerfully to pay his notes, and enable the receivers of the bank to do something towards paying the creditors, who, after all, must sustain a very great loss in the winding up of the institution. If he can escape by paying one-fifth of his subscription instead of the whole, he has no reason to complain of the receivers. A new trial is not advised.

In this opinion the other judges concurred; except HIN-
MAN, J., who, having tried the case in the court below, did
not sit.

New trial not advised.