## Marine Court.

*General Term—April, 1883.*

## J. VECHTEN OLCOTT, Receiver, &c., Plaintiff and Respondent, *against* JAMES E. CHANDLER, Defendant and Appellant.

The fraud of a corporation in procuring a person to become a subscriber to its stock may be a complete defense to a suit brought by the corporation; but it is no defense to an action brought by a receiver of the corporation, because he represents its creditors, and, therefore, has higher rights than the corporation. But as against an ordinary purchaser of stock after the formation of the corporation is completed, the receiver merely takes title to the cause of action subject to all equities existing against the corporation.

Appeal from judgment rendered by the court on a trial without a jury.

The note in suit, for $3,000, was made by the defendant and delivered to the Brittenstene Silver Mining Company for 1,000 shares of the capital stock of said corporation, of the par value of $10 a share. In consideration of this note the company agreed to issue and deliver said shares to the defendant. The company delivered 166 of these shares, but there was no proof showing that it ever issued or delivered to the defendant the remaining 834 shares.

The contract of the corporation was to issue and deliver 10,000 shares of its stock for the defendant's note for $3,000. The defendant paid $1,750 on the note, and the present action was commenced by plaintiff, as receiver of the said corporation, to recover $1,250 claimed as the balance due thereon.

The defendant, among other defenses, pleaded that

Olcott v. Chandler.

the note was obtained from him by the corporation by means of fraudulent representations made by one of the officers of the company, which were afterwards approved of and ratified by it. The misrepresentations were as to material facts respecting the mines of the corporation, their capacity, productiveness and value, as well as the value of the stock purchased. These representations, although fully believed and relied upon by the defendant, were false in fact, and were known to be false by the corporation when they were made. The stock was, in fact, of little value, and thus the defendant was damnified far beyond the balance claimed to be due upon the note.

Upon the trial the plaintiff admitted "all the allegations of fraud, as alleged in the defendant's answer, to be true." This admission established the fraud above stated. The trial judge gave judgment for the plaintiff, and the defendant appealed.

*Robert P. Harlon*, for appellant.

*Chas. De Hart Brower*, for respondent.

McADAM, J.—Although the trial judge found as a matter of fact that the defendant had been defrauded, and that the fraud would have furnished him with a good defense if the action had been brought by the corporation guilty of the fraud, he nevertheless found against the defendant upon the ground that the plaintiff, as receiver, had higher rights than the company which he represents, and this upon the theory that the plaintiff, as receiver, represents, not only the corporation, but its creditors, and that the capital stock of the corporation is a trust fund for the payment of creditors, and that where the rights of innocent third parties are concerned, the fraud of the corporation ceases to be a defense to the person subscribing to the

capital stock, upon the familiar principal that where
one or two innocent persons must suffer by the fraud
of a third person, the loss must fall upon him who
first gave the credit.

    The theory is founded on well-settled legal grounds,
and the only question that need be considered is
whether the present case comes within the rule stated.
I think it does not, for the reason that the defendant
was not an organizer of the corporation and had no
voice in its formation.  He was not a subscriber to the
capital stock within the sense in which that term is
employed by the authorities.

    The corporation was formed and in legal existence
when the defendant became connected with it, and his
contract was one of purchase only.  He contracted to
buy and the corporation contracted to sell to him so
many shares of its capital stock.  The distinction be-
tween an original subscriber and a purchaser like the
defendant is well defined (St. Paul, Stillwater & T. F.
R. Co. v. Robbins, 23 *Minn.* 439 ; Minneapolis Har-
vester Works v. Libby, 24 *Id.* 327 ; Carlisle v. Saginaw
Valley & St. Louis R. R. Co., 27 *Mich.* at p. 319).
Under these authorities the corporation was bound to
tender the stock to the purchaser before he could be
sued for the purchase price.

    The corporation delivered to the defendant in this
case 166 shares of its capital stock, but never tendered
or delivered the remaining 834 shares.  The amount
paid by the defendant exceeded the agreed price of
the 166 shares received by him.  The fraud practiced
upon the defendant furnished him with a good legal
excuse for not proceeding and paying the balance
of the purchase price, even if the 834 shares had been
tendered to him.  Fraud, accompanied by damage,
is a good ground of action or defense, and in this
instance the damages arising from the fraud were con-

Olcott *v.* Chandler.

ceded to be more than the unpaid purchase money claimed to be due.

The defendant was not bound to rescind the contract of purchase unless he intended to make such rescission the basis of a claim for the return of the money paid, and the fact that he made an ineffectual attempt to rescind, does not deprive him of the legal right to insist that by reason of the fraud he should not be required to pay more than the actual value of the thing he purchased.

The right to recoup exists independently of the right of counterclaim, and courts have gone so far as to hold that even under a general denial the defendant may prove that the work sued for was unskillfully done, and thus diminish the amount of the plaintiff's recovery (Raymond *v.* Richardson, 4 *E. D. Smith*, 171 ; *Id.* 512 ; 31 *Barb.* 534 ; approved in 41 *N. Y.* 113, 116).

The defendant has already paid more than the agreed price of the stock he received, and more than the actual value of the stock he agreed to purchase, and I know of no principle of justice that requires that he should be compelled to submit to be further defrauded unless he comes within the rule of law which enables a receiver as the representative of the creditors of the corporation to shut out all the equities which exist in favor of the defrauded party, to the end that the creditors may, as far as possible, realize their respective demands from the assets of the insolvent corporation.

Upon this branch of the case I have already endeavored to show that the rule invoked by the receiver has no application to a case like the present, and the distinction I have pointed out is well illustrated by two cases decided by the courts of Connecticut.

In Litchfield Bank *v.* Church (29 *Conn.* 137), the rule invoked by the receiver was properly applied.

In Litchfield Bank v. Peck (29 *Conn.* 384), a case very much like the present, the exception to the general rule was clearly defined and enforced, and must control the disposition to be made of this appeal. Under the exception stated, the receiver succeeds to the rights of the corporation against the defendant, subject to whatever equities exist in his favor (see also Bell v. Shibley, 33 *Barb.* 610; Davendorf v. Beardsley, 23 *Id.* 656; Bedell v. North American Life Ins. Co., 7 *Daly*, 278; Cutting v. Dameral, 88 *N. Y.* 410).

The fact that the defendant acted as a director in the corporation, and endeavored to resuscitate the company and save the money he had invested in its stock, should not detract from his rights. The company was, at and prior to that time, insolvent, and the effort which he made did not injure the creditors, nor was it calculated to injure them. If, as a director, he has incurred a liability to the creditors, for misconduct or otherwise, the remedy of the receiver will be found in an action on the case or under the statute, and the damages recoverable may, perhaps, exceed the price which the defendant agreed to pay for his stock, and it may even extend to its full par value ($10,000); but the fact that the defendant may possibly have incurred a penalty recoverable in some other form of action does not assist the plaintiff in an action of assumpsit to enforce a contract of purchase tainted with fraud.

For the reasons stated, the judgment appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.

SHEA, Ch. J. [Concurring.]—The defendant was a purchaser, not a subscriber to the company's capital stock. Therefore, the action itself is ill-conceived, and the fraud, as alleged in the answer, being conceded on the trial, no recovery in such action can be had either by the company or by a receiver.

Olcott *v.* Chandler.

HALL, J. [Concurring.]—The authorities seem to me to make a clear distinction between the position and rights of a receiver of a corporation as against an original subscriber to the capital stock of such corporation, and one who merely purchases stock after the organization.  As regards the first class, the receiver represents the .creditors as well as the corporation; the creditors being supposed to give credit upon the strength of the amount of stock subscribed and paid in.  In the latter case he only represents the corporation and has no higher rights.  It is clear in this case that the defendant was not an original subscriber to the stock, but merely a purchaser, and in view of the admitted fraud, the corporation could not have recovered against him.  The fraud being admitted, the burden of proof was changed, and the plaintiff was bound to prove knowledge of the fraud in defendant, or such laches upon his part as would charge him in law with knowledge, and then some act ratifying the same or electing still to hold his contract.  I don't think his issuing or signing the circular in evidence alters his position.  If he has committed a wrong he can be held liable in a proper action.

### Liability of original subscribers.

" When a person subscribes to the capital stock of a corporation, he must be held to contemplate and intend that the corporation shall incur debts and pledge its capital, including the subscriptions of its members, as security.  Creditors who, in good faith, trust the corporation upon the faith of this security, stand in the position of innocent purchasers for value to the extent of their equitable lien; and it would be most unjust to permit a stock subscriber to disaffirm his contract and refuse to pay his share of the capital, after it has thus been pledged, with his knowledge and consent, to innocent third parties.  It has accordingly been settled that, if a corporation is insolvent, a shareholder whose contract of subscription was obtained by the fraud of the company's agents, cannot diminish the security of *bona fide* creditors, by rescinding his contract to contribute the amount of capital subscribed by him " . . . (*Morawitz on Corporations*, § 596.)

"In the absence of a statutory provision, the rule seems to be that a

shareholder whose contract of subscription was procured by fraud would be liable to contribute his share of capital, upon the insolvency of the corporation, *so far as this may be necessary in order to satisfy those creditors whose claims attached before he elected to disaffirm his contract,* but creditors who contracted with the corporation after the shareholder elected to cancel his contract and sever his connection with the corporation have no lien upon the unpaid stock subscription " (*Ib.*).

### In case of subscription after organization, the corporation must issue the stock.

If the corporation is fully organized at the time of the subscription, it does not stand upon the same footing as a subscription made prior to, and for the purpose of effecting the organization. A subscription prior to organization gives to the subscriber an interest in the corporation, and the right to take part in organizing it, and this interest and right are a sufficient consideration to support his promise. But the subscription in this case (in the language of the case cited), does not appear to have been to the original stock; on the contrary, it appears that, after the company was fully organized, its board of directors and directed the issuance of what, in the amended complaint is called "preferred capital stock " and also directed that the company's books should be opened to receive subscriptions for the same. The mere subscription for this stock, while it constitutes a valid contract on the part of the company to issue the stock to the defendant upon his paying for it, and, on his part, to receive and pay or it, does not give him an interest in the company, nor vest in him the title to the stock. It can be sustained as a contract only on the implied promise of the company to issue the stock to him. No time is appointed in the writing subscribed, for the payment of the money or the issuance of the stock, except that the subscription should not be valid until $65,000 of the stock should be subscribed for. We regard the two promises as concurrent and dependent, and that neither party could require the other to perform, without performing or offering to perform the promise on his part. As the plaintiff has neither issued the stock, nor offered to issue it, the action is prematurely brought (St. Paul, Stillwater & T. F. R. Co. *v.* Robbins, 23 *Minn.* 439; Minneapolis Harvester Works *v.* Libby, 24 *Id.* 327).

Where persons subscribe for a future organization, their mutual agreements for a common enterprise may operate as mutual considerations till the enterprise becomes organized, and thereby the common interest is carried into its proposed form. But where the corporation is already in existence, a stock subscription is a transaction between the subscriber and the company, and the obligation of one can only

People *ex rel.* Sanders *v.* McAdam.

be sustained by the corresponding obligation of the other. If both are not bound, neither is bound and the transaction is a nullity (Carlisle *v.* Saginaw Valley & St. Louis R. Co., 27 *Mich.* at p. 319).

" It is submitted that the right to sue the company, for the fraud of the directors, is not destroyed by their insolvency, and by the voluntary winding up; possibly the plaintiff may be liable to contribute to the assets and to pay further calls, and if they obtain judgments in those actions they may not be able to enforce them until all the creditors shall have been satisfied; but they have vested rights of action which can be taken away only by the provisions of some statute, and no statute deprives a defrauded stockholder of the means of obtaining redress from the company  A great distinction exists between a winding up by the court and a voluntary winding up; a winding up by the court is a proceeding intended to reach the property of the company for the benefit of the creditors; and hence no suit can be carried on which is likely to diminish the amount of the assets " (Stone *v.* City & Co. Bk., *L. R.* 3 *Com. P. D.* at p. 301).

### Effect of fraud where rights of creditors intervene.

Whenever the rights of other parties intervene, a contract to take shares, though induced by fraud, cannot be rescinded (Henderson *v.* Royal British Bk., 7 *El. & Bl.* 356; Dorsett *v.* Harding, 1 *C. B. N. S.* 524; Porvis *v.* Harding, *Id.* 533; Dainell *v.* Official Manager of Royal British Bk., 1 *H. & N.* 681; Reese, &c. Mining Co. *v.* Smith, *L. R.* 4 *H. L.* 65; Ætna Ins., &c. Co., 6 *Ir. Rep. Eq.* 298; McNeill's Case, *I. R.* 10 *Eq.* 503; Houldsworth *v.* City of Glasgow Bk., *L. R.* 5 *App. Cas.* 317).